P. O. WEBER v. CHARLES ROGAN, COMMISSIONER.

No. 838. Decided June 28, 1900.

1. **Sale of School Land—Detached Timbered Sections—Statutes Construed.**

Revised Statutes, article 4218y, permitting or directing the sale of detached and isolated sections of school land "at one dollar per acre, upon the same terms as other public lands are sold under the provisions of this chapter"—there being no provisions in the chapter mentioned which are applicable to all lands alike—must be construed to require detached timbered sections to be sold as other timbered lands are authorized to be, that is, for cash only. (P. 68.)

2. **Sale of School Land—Detached Sections—Price—Statutes Construed.**

In the provisions for sale of isolated sections of public school land, Revised Statutes, article 4218y, the word "may" is to be construed in its literal sense, as permitting, and not as commanding the Commissioner to sell such sections at the price of one dollar per acre named in the act; his control over the price remains as under the former laws; and he can not be compelled by mandamus to accept an application to purchase at one dollar. (Pp. 68-71.)

3. **Statutory Construction.**

The controlling rule of statutory construction is, that the intent of the Legislature must govern. In determining whether the word "may," in the act authorizing sale of detached sections of school land by the Land Commissioner at one dollar per acre is mandatory, or merely permissive, the rule which requires that it be taken in the sense of "shall," in a matter in which the public have an interest to be promoted by the exercise of a power by a public officer, must yield to the evidence of a different intent found in other parts of the act and by a review of the previous legislation on the same subject; so, and for the same reason, must be disregarded the rule that would infer an intent to take away the discretion given the Commissioner, from the omission, in the act, of the words "not less than," contained in previous laws fixing the price at which sales should be made. (Pp. 68, 69.)

ORIGINAL APPLICATION to the Supreme Court for writ of mandamus against the Commissioner of the General Land Office.

*M. E. Kleberg* and *Ashby S. James*, for relator.

*T. S. Smith*, Attorney-General, and *R. H. Ward* and *T. S. Reese*, Assistants, for respondent.

OPINION ON ORIGINAL SUBMISSION.

GAINES, CHIEF JUSTICE.—This is an original action for a writ of mandamus brought by the relator against the Commissioner of the Land Office to compel the respondent to award to the relator two parcels of school lands which he had made application to purchase. The allegations in the petition are not denied. From these allegations, it appears that on the 11th day of August, 1899, the two tracts of land, —one lying in Jefferson County and consisting of 320 acres, and the other situate in Polk County, and embracing 640 acres,—were unappropriated public free school lands, and were "isolated and detached" within the meaning of the Act of May, 1897, with reference to the sale of the public free school lands; and that on that day the relator filed an application to purchase each of these parcels at the price of

$1 per acre. Each of these applications was in due form and was accompanied by a tender of one-fortieth of the purchase money and by the relator's obligation for the payment of the balance as provided by the law then in force. It was also averred that the respondent had refused to award him the lands.

The respondent for answer admits that the relator made application to purchase the lands, as averred by him in his petition, but avers in substance, that under the law in force at the time the applications were made, the section in Polk County had been classified as timbered land and had been appraised at $8 per acre, and also that the half section had been classified as grazing land and had been appraised at $2.50. He claimed that because they were not agricultural lands, they were not subject to sale as "isolated and detached sections" under the law existing at the time the applications were made. In regard to the latter tract, it was also averred that it had previously been sold, but that he, as Commissioner of the General Land Office, on the 20th of July, 1899, had declared the title of the purchaser forfeited for non-payment of interest, and that he did not again place it upon the market until the 1st of September thereafter. He therefore claimed that at the time of the application the tract last mentioned was not subject to sale, for the reason that it had not been again placed upon the market. The allegations of the answer were excepted to but were not denied.

At the time the applications to purchase were made, the following law was in force: "The Commissioner of the General Land Office may withhold from lease any agricultural lands necessary for the purpose of settlement, and no agricultural lands shall be leased, if, in the judgment of the Commissioner, they may be in immediate demand for settlement, but such lands shall be held for settlement, and sold to actual settlers only, under the provisions of this chapter; and all sections and fractions of sections, in all counties organized prior to the first day of January, 1875, except El Paso, Presidio, and Pecos counties, which sections are isolated and detached from other public lands, may be sold to any purchaser, except to a corporation, without actual settlement, at one dollar per acre, upon the same terms as other public lands are sold under the provisions of this chapter." 2 Batts' Rev. Stats., art. 4218y. The determination of the case before us depends upon the construction of this statute. If by this law it is made the imperative duty of the Commissioner of the General Land Office to sell all isolated sections and parts of sections of the public free school lands to the first applicant without regard to their classification, then the writ here applied for should be awarded; otherwise, it should be denied.

Upon first impression, we were inclined to the opinion that the provision in question was directory and not mandatory. We recognize the rule announced by the late Chief Justice Stayton, in Smisson v. State, 71 Texas, 236, in the following language: "The word 'may' in the connection used in the sixteenth section was doubtless used in

the sense of 'shall,' and therefore was mandatory. Such is the settled construction where the subject matter is one in which the public have an interest to be protected or promoted by the exercise of a power or performance of a prescribed duty by a public officer, unless the context shows that the word was used in its primary signification." The difficulty with the article is that the context tends in some degree to show that the word "may" in the last provision was used in its primary sense. The article begins by using the same word in the sense of permission, then it uses the word "shall"—an undoubted word of command—and then returns to the use of the word "may." If we had nothing but the letter of the article to throw light upon the intention of the Legislature, we therefore think it would be difficult to say that the word "may" was not used in the same sense in the second instance as it was used in the first. But when we review the history of the provision, the difficulty disappears. The provision for the sale of the "isolated and detached" sections or parts of sections of the public free school lands first appeared as section 22 of the Act of April 1, 1887, in relation to the classification, lease, and sale of the State's lands set apart for the benefit of the free schools, the University, and the asylums of the State. That section reads as follows: "The Commissioner of the General Land Office, under the direction of the Governor, may withhold from lease any agricultural lands necessary for purposes of settlement, or, in his discretion, he may lease such agricultural lands in small quantities for a less period than five years, as the public interest and development of the country may seem to require; and no agricultural lands shall be leased if in the judgment of the Commissioner they may be in immediate demand for settlement, but such lands shall be held for settlement and sold to actual settlers only, under the provisions of this act; and all sections or fractions of sections in all counties organized prior to the first day of January, 1875, except El Paso, Pecos, and Presidio counties, which sections are detached and isolated from other public lands, may be sold to any purchaser, except to a corporation, at not less than two dollars per acre, upon such terms as the Commissioner of the General Land Office may prescribe." This section was amended by section 26 of the Act of May 4, 1895, but so much thereof as related to the sale of detached sections was left unchanged. Section 26 appears in the Revised Statutes of 1895 as article 4218y. It was amended in 1897, and, as so amended, was the law in force at the time the relator applied for the purchase of the lands in controversy. It thus appears that until this article was amended by the Act of 1897 the Commissioner had a discretion both as to the terms of the sale and as to the price, subject, however, to a minimum limit. The article so amended took away all discretion as to the terms of the sale by providing that the sale should be "upon the same terms as other public lands are sold under the provisions of this chapter." (The chapter meant is chapter 12a, of title 87.) And it is very clear to our minds that if it had not been

intended to take away all discretion as to the price, the Legislature, instead of using the words "at one dollar per acre," would have said "at not less than one dollar per acre,"—the form of expression used in the very article they were amending. By changing the language from the words "not less than two dollars per acre" to the words "at one dollar per acre," they must have intended not only to reduce the minimum to one dollar per acre but also to fix the price at that sum. Such seems to have been the construction put upon the act by the next Legislature, for in 1899 the article was again amended so as to read "at not less than one dollar," etc. Laws 1899, p. 235. This last act had not gone into effect when the applications to purchase in this case were made.

It is to be observed that the provision in question only applied to lands lying in counties which had been organized before January 1, 1875. Isolated sections and parts of sections of such lands had long been upon the market when the act which embraced this provision was passed, and had remained unsold. The presumption was that they were of little value and not marketable under the general provisions of the act. They were like the unsold remnants of a stock of merchandise,—not sold because not salable upon the terms and conditions upon which the bulk of the stock had been sold. This consideration doubtless impelled the Legislature to enact the special provision for the sale of detached lands. Therefore, in the original act, they removed all restrictions save as to a minimum price, and provided that such lands should be sold at such price not below $2 per acre and upon such terms as the Commissioner of the Land Office might prescribe. It was ten years after the passage of the first act which conferred this power upon the Commissioner that the amendment was passed which was in force when the relator made application to purchase the lands in controversy in this case. The consideration which led to the first action of the Legislature bore with greater force at the time the amendment was adopted. The Legislature doubtless then felt that the previous law had been inadequate for the disposition of these remnants of public free school lands, and that to effect a sale it was necessary not only to lower but to fix the price and to take away all discretion in the premises from the Commissioner. The history of the legislation and the circumstances surrounding its subject matter impel to the conclusion that the purpose of the Twenty-fifth Legislature, in passing the amendment of 1897, was to make it the duty of the Commissioner of the General Land Office to accept all bids for isolated sections and parts of sections of the school lands at a dollar an acre, upon the purchasers tendering the part of the purchase money and the obligation for the balance, as was required by the general law.

But it is urgently contended that the provision applies only to agricultural lands, and that since the parcels in question have been classified, the one as timbered and the other as grazing lands, the relator acquired no right by his applications. This contention is based

upon the fact that the first provision in the article is expressly applicable to the agricultural lands. The argument is that this shows that in adopting the article in question the Legislature had in mind only the agricultural lands, and that therefore the words "all sections and fractions of sections" meant all sections and fractional sections of agricultural lands. We can not concur in the proposition. We attach no importance to the fact that the provision about agricultural lands and that about detached parcels are found in the same section of the law. It is undoubtedly the custom to embrace provisions relating to divers matters in the same section or article of a statute, and there can be no objection to the practice provided all relate to the same general subject named in the title of the act. In the provision in controversy, the Legislature says "all sections and fractions of sections," and the words mean, literally, all such sections and fractions without regard to their classification as agricultural, grazing, or timbered lands. We think they meant what they said. In the original act, the section which contains the provision as to isolated and detached lands is nearly the last. The previous twenty-one sections contained full regulations for the sale and lease of the free school and asylum lands. When this was done, there remained certain exceptions to be provided. The Constitution required the lands to be sold, and hence it was deemed proper to authorize such of them to be held for sale as were in immediate demand for actual settlement. Also, as has been previously shown, in order to effect a sale of "isolated and detached sections and fractions of sections" of the lands, it was expedient to except them from the general rule and to make special provision for the sale thereof. Not only was there no incongruity in providing for both of these exceptions in one section, but it seems to us that it was a natural and logical method of making the provisions. In the original section, perhaps the most important provision in regard to the isolated lands is that any person, not a corporation, could be a purchaser. All other lands were to be sold to actual settlers only. Surely the lands most desirable for settlement and most likely to be applied for by actual settlers were those adapted to the purposes of agriculture. It therefore seems to us that if the Legislature had desired to except either class from the operation of the provision, the agricultural lands are the last they would have excepted, for, so far as we can see, every consideration which impelled them to except the isolated and detached sections from the general rule laid down by the statute, applied with more force to the timbered and grazing lands than to the agricultural sections.

But as to the half section situated in Jefferson County, there is another question to be determined. After the Commissioner had declared that parcel forfeited, was it necessary that the forfeiture should be reported to the county clerk of the county in which the land is situated before it was again subject to purchase? The provisions in general of the chapter regulating the sale of the public school and asylum lands, do not apply to the "isolated and detached sections and

fractions of sections." As already seen, they required no classification; nor was any appraisement necessary as a condition precedent to their sale. Before the amendment of 1897, the Commissioner fixed the price at not less than $2 per acre. Under that amendment, the law fixed it absolutely at $1, and directed that the lands should be sold upon the same terms as other public lands were sold, under the provisions of the chapter of which it was made a part. By "terms" are meant the times of the payment of the installments of the purchase money and the rate of interest on the deferred payments. It does not mean under the same regulations, because, as we have seen, no regulations were necessary. The law having fixed the price and terms of sale, all that was necessary to acquire an inchoate title was to make application to the Commissioner and to tender the proportion of the purchase money required by the law to be paid in cash, together with the statutory obligation for the balance. Jumbo Cattle Co. v. Bacon & Graves, 79 Texas, 5.

We think the writ of mandamus should issue as prayed for, and it is accordingly so ordered.

Opinion delivered January 22, 1900.

### ON MOTION FOR REHEARING.

GAINES, CHIEF JUSTICE.—The motion and argument for a rehearing contains much matter which would have been very properly addressed to the Legislature while it had under consideration the statute which gave rise to this suit; but which is hardly proper to address to a court which is called upon to construe the law. If there was any provision of the Constitution which prohibits the Legislature from passing improvident laws, we would most likely be amply justified in disregarding the law in question.

However, the motion calls our attention to certain provisions of the Revised Statutes in relation to the sale of timber upon the school lands and the timber lands themselves, which are claimed to be inconsistent with the idea that the article in reference to "isolated and detached" sections was intended to apply to the timbered lands. This presents a point which was not presented upon the argument at the hearing and upon which further argument is appropriate. The motion for a rehearing is therefore granted, and the cause will be set down for argument upon such day as may be agreed upon by the parties, with the consent of the court.

Filed March 8, 1900.

### OPINION ON REHEARING.

GAINES, CHIEF JUSTICE.—The argument for the respondent, upon the second submission of this case, has placed the matter in a new light and has led us to the conclusion that our former judgment was erroneous and that the writ of mandamus should be denied.

Our opinion is, that even if it be held that article 4218y applies to all lands alike, and if it takes away the discretion of the Commissioner of the General Land Office to refuse a bid of $1 per acre, yet the relator can not have a judgment in this case as to the timbered section. That article prescribes that the lands therein designated shall be sold "upon the same terms as other public lands are sold under the provisions of this chapter." There are no provisions in the chapter mentioned which are applicable to all lands alike. Timbered lands are to be sold for cash, and agricultural and pasture lands upon a long credit. So that, if the timbered sections be included in the article under consideration, the provision quoted admits of no reasonable construction save that the timbered sections are required to be sold as other timbered lands are authorized to be sold under the provisions of the chapter, and the agricultural and pasture lands are to be sold as is provided in other articles for the sale of such lands; that is to say, the former for cash and the latter in equal annual installments, extending over many years. This seems to us to be fatal in any event to the claim of the relator to the timbered section. If he had the absolute right to purchase the timbered section at $1 per acre, he could in no event have perfected his right to that land except by tendering the purchase money in full. This he did not do.

But as to the half section of pasture land, the case is different. Under the statute, the pasture lands are salable upon the same general terms as agricultural lands; and the relator having tendered one-fortieth of the purchase money and his obligations for the payment of the thirty-nine additional annual installments, as required by the statute for the sale of such lands, was entitled to have the land awarded to him, provided the respondent was absolutely required to sell the land at $1 per acre. Therefore, our conclusion as to the timbered section does not relieve us from the duty of reviewing our opinion upon the more important question and of determining whether or not the Commissioner, under article 4218y, had a discretion to refuse an offer of $1 per acre for sections of land which were isolated and detached.

In our former opinion, we held in effect, that the fact that the article under construction omitted the words "not less than" from section 22 of Act of April 1, 1887, of which such article was an amendment and for which it was a substitute, led to the conclusion that the purpose was to take from the Commissioner of the General Land Office the discretion, with which he was previously invested, to refuse the minimum price. The majority of the court are now of opinion that we erred in that conclusion. The rule is recognized that in the construction of statutes the history of previous legislation upon the subject should be considered, and that a change of language of a statute, by the omission or addition of one or more words, should ordinarily be presumed to have been made for a purpose. But the one controlling and effective rule of construction is that the intent of the Legislature

must govern. Every other recognized rule is subsidiary to this fundamental canon ·of construction and must yield when it is believed that its application would lead to a result contrary to that which the Legislature actually intended. While the omission of the words "not less than" in the article we are considering tends to show that it was the intention of the Legislature to deprive the Commissioner of the power of fixing the price of isolated sections, it is not necessarily conclusive of that question. As indicated in our former opinion, if article 4218y of the Act of 1887 had been the first provision upon the subject of the sale of isolated sections of the free school lands, we should have felt constrained to hold that the word "may," as there used, was employed in the sense of permission and not of command, and this notwithstanding the well recognized rule announced in the case of Smisson v. State, there cited. Though it is a matter "in which the public have an interest to be   *   *   *   promoted by the exercise of a power   *   *   *   by a public officer," and though in such a case it is the ordinary rule to construe "may" as meaning "shall," yet we thought that the context indicated that such was not the purpose. Such being the case, it is not unreasonable to presume that the Legislature may have intended to use the word "may" in the ordinary sense of permission and have deemed it unnecessary to retain the words which were omitted in the former act. .In that act, the word in question could not have been employed as a word of command, for the reason that by other terms employed the officer was empowered to reject any offer, in the event he deemed the price offered less than the value of the land.

Now it is to be noted that in every statute that has been passed which provides for the sale of the school lands, from the year 1883 down to the passage of the article under consideration, especial provision has been made for the sale of those which are chiefly valuable for the timber upon them. The Act of April 12, 1883, provided that such lands should not be sold at less than $5 per acre, while other lands without water upon them were salable at a minimum price of $2, and those with water at $3 per acre. Laws of 1883, p. 85. Substantially the same provision is found in section 7 of the Act of April 1, 1887. Laws of 1887, p. 85. That act also provides in substance that timbered lands shall be paid for in cash. The sections which contained these provisions were not amended by the Act of April 8, 1889 (Laws 1889, page 50); nor by that of April 29, 1891 (Laws 1891, page 180). By the Act of April, 1895, the minimum price of agricultural lands was reduced to $2 and that of pasture lands to $1 per acre; but the minimum price of timbered land was left at $5, as previously fixed. This act also retained the provision that such lands should be sold for cash only. Laws 1895, p. 61. It also added the following section: "Sec. 16. The Commissioner of the General Land Office shall adopt such regulations for the sale of the timber on the timbered lands as may be deemed necessary and judicious. Such timber shall not be sold for

less than five dollars per acre, cash, except in such cases as the Commissioner may ascertain by definite examinations by an approved agent appointed by him for that purpose, to be paid by the purchaser, to be sparsely timbered or containing timber of but little value, in which case he may sell the timber on such sections or part of sections at its proper value; provided, such timber is sold at not less than two dollars per acre. The purchaser shall have five years from the date of his purchase within which to remove the timber therefrom, and in case of failure to do so, such timber shall thereby be forfeited to the State without judicial ascertainment; provided, that all timbered lands from which the timber has been cut and taken off may be placed on the market and sold as agricultural or grazing lands, according to classifications to be made by the Land Commissioner; provided, that the purchaser or his vendees of any such timber shall have the right to purchase the land upon which such timber so purchased is situated at two dollars per acre, cash, at any time before the expiration of five years from date of purchase of timber under the provisions of this act." All these provisions, in relation to the sale of timbered lands and of the timber thereon, were retained in the Act of May, 1897, of which article 4218y constitutes a part. Now, conceding, for the purposes of the argument, that the previous laws in regard to the sale of the detached sections applied to pasture and timbered lands as well as agricultural lands,—such provisions are not inconsistent with the previous policy of the law in relation to timbered land as shown by our legislation upon the subject, for the reason that before the Act of 1897 the Commissioner was not bound to sell at a fixed sum, but had the liberty to refuse any offer which, in his opinion, was less than the value of the land. Rare instances might exist in which a tract might not be worth more than the minimum fixed by the act. In such cases, he was empowered to sell at that price; but it was not to be presumed that he would sell any land at less than its actual value. But to say that it was the intention of the Legislature in making the amendment not only to reduce the minimum price of the isolated sections to one-half of what it had been under the previous law, but also to deprive the Commissioner of all discretion and to make it his absolute duty to sell at that price, is to attribute to them a purpose to make a radical departure from the previous course of legislation upon the subject and to attach a value to detached sections of timbered land in no degree consistent with the value fixed by them and by other Legislatures upon timbered lands, when not detached. What may be the actual value of these detached lands, we do not know; nor have we the means of ascertaining their value. It appears, however, in this case, that the timbered section in controversy had been lawfully appraised at $8 per acre; and from this the presumption may be indulged that there were other sections which had been appraised at more and which were worth much more than $1 per acre. Under these circumstances, to hold that the Legislature intended to force the sale of these detached sections,

merely because they were detached, at 20 per cent of the price put upon timbered lands generally, is to attribute to them a degree of improvidence which ought not to be imputed when the language of the statute admits of any other reasonable construction.

For these reasons, the majority of the court are of opinion that the word "may" in article 4218y of the Revised Statutes ought to be construed in its literal sense,—that is to say, as a word merely conferring a power upon the Commissioner to sell the lands therein specified at $1 per acre, and not as making it obligatory upon him to do so. I incline to our former opinion, but am also inclined to concur in the result, but upon a different ground. But since my views are not those of the majority of the court, it would serve no useful purpose to express them here.

The writ of mandamus is denied.